

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 OCT 14  AM 10: 57

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ST. BERNARD CITIZENS FOR                    CIVIL ACTION
ENVIRONMENTAL QUALITY, INC.,
AND LOUISIANA BUCKET BRIGADE

VERSUS                                       NO.   04-0398

CHALMETTE REFINING, L.L.C.                   SECTION "R" (1)

### ORDER AND REASONS

Plaintiffs St. Bernard Citizens for Environmental Quality, Inc. and Louisiana Bucket Brigade move for partial summary judgment on defendant's liability for various violations of the Clean Air Act and request injunctive relief for some of those violations.  Defendant Chalmette Refining, L.L.C. opposes the motion.  For the following reasons, the Court GRANTS plaintiffs' motion for summary judgment on liability and orders additional briefing on the propriety of injunctive relief in light of Hurricane Katrina.

### I.   BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are nonprofit corporations formed to address environmental issues in St. Bernard Parish and in Louisiana.  On

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

February 12, 2004, plaintiffs sued Chalmette Refining under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a), and the citizen suit provision of the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11046(b)(1).  Plaintiffs allege that Chalmette Refining has violated and continues to violate (1) hourly permit emission limits for various harmful pollutants, (2) flare performance standards and monitoring requirements, (3) benzene emission limits for its storage tanks, (4) State reporting requirements for "unauthorized discharges" of pollutants and (5) EPCRA reporting requirements.  Plaintiffs allege that these violations endanger the health and damage the quality of life of their members who live near defendant's refinery.  Plaintiffs' complaint requests a declaration that defendant has committed these violations, an injunction requiring it to cease the violations, civil penalties and attorney's fees. 42 U.S.C. § 7604(g).

On May 18, 2004, plaintiffs filed a motion for partial summary judgment on two issues.  First, plaintiffs requested summary judgment on defendant's liability for 34 violations of its emissions permits, including eight violations of flare performance standards, 17 unauthorized discharges of oil, and nine unauthorized discharges of pollutants.  Second, plaintiffs requested summary judgment on the issue of standing, arguing that

members of their organizations suffered an injury that is fairly traceable to defendant's unauthorized discharges and that is redressable by the Court.

On June 23, 2004, by stipulation of the parties, the case was stayed until August 20, 2004 to facilitate settlement negotiations. The case was stayed again twice, with the final stay expiring on September 27, 2004. On September 27, 2004, defendant moved to stay the matter for 180 days, arguing that the Louisiana Department of Environmental Quality had initiated administrative enforcement actions and permit negotiations that would likely remedy the violations at issue in the lawsuit. The Court found that a discretionary exercise of its power to stay was inappropriate. *See St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 348 F. Supp. 2d 765, 7767-69 (E.D. La. 2004). Although the Court denied defendant's request for a stay, it granted its alternative request for a continuance of plaintiffs' summary judgment motion. On February 3, 2005, the Court granted plaintiffs' first motion for partial summary judgment on standing and on liability for the 34 discharges involved in the summary judgment motion. *See St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref.*, 354 F. Supp. 2d 697, 701-06 (E.D. La. 2005).

Plaintiffs now move for partial summary judgment on

3

defendant's liability for an additional 2,629 alleged violations
of the Clean Air Act.  The alleged violations consist of (1)
1,273 violations of permit limits on emissions of benzene from
the refinery's two benzene tanks since 2003; (2) 536 violations
of permit limits on emissions of sulfur dioxide from the
refinery's flares since 2002; and (3) 820 violations of "new
source performance standards" for flares and monitoring of flares
since 1999.  Because defendant's benzene tanks allegedly exceed
its permit limits for benzene emissions on a consistent basis,
plaintiffs also request that the Court issue an injunction
ordering defendant either to conform its operation of the benzene
tanks to its permit limits or to close them within 30 days.
Plaintiffs' request for injunctive relief is limited to emissions
from the benzene tanks.

     After plaintiffs filed their second partial summary judgment
motion, defendant entered an Administrative Consent Order with
the LDEQ, effective May 24, 2005.  The order requires defendant
to submit updated Clean Air Act permit applications.  (Def.'s
Supp. to Opp. Pls.' Mot. Summ. J., Second Aff. of Claudine Gorman
at ¶ 4).  The order also states that, "[u]ntil such time as the
Department takes final action on the . . . permit applications,
or otherwise notifies Chalmette Refining, Chalmette Refining
shall operate its emission sources in compliance with the interim

4

emission limitations and monitoring and reporting requirements set forth in Appendix A." (*Id.* at ¶ 5).

The Court heard oral argument on plaintiffs' motion and considered the briefs of the parties. In the interim, Hurricane Katrina left its mark on St. Bernard Parish. Consequently, the Court rules as follows.

## II.  **LEGAL STANDARD**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

## III. **DISCUSSION**

### A.  **Applicable Law**

#### 1.  **The Clean Air Act**

5

Congress created the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act, 42 U.S.C. §§ 7401, et seq., is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines the concentrations of those pollutants that are safe and promulgates those determinations as national ambient air quality standards. See 42 U.S.C. §§ 7408, 7409. Each state must ensure that its ambient air meets the appropriate NAAQS, see 42 U.S.C. § 7407(a), and must develop a state implementation plan to achieve the standards established by the EPA. See 42 U.S.C. § 7410(a). The Act requires state implementation plans to include "enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance" to meet the NAAQS. 42 U.S.C. § 7410(a)(2)(A). Upon approval by the EPA, the state implementation plan becomes federally enforceable. *Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1164 (D. Ariz. 2001). For entities regulated under the Clean Air Act, "[t]he burden is clearly on the source

6

to do whatever is necessary to assure compliance."  45 Fed. Reg. 59,874, 59,877 (Sept. 11, 1980).

The Clean Air Act also requires the EPA to develop new source performance standards to govern emissions of air pollutants from facilities that are constructed or modified after the publication of regulations.  42 U.S.C. § 7411(a)(2), (f). After the EPA promulgates new source performance standards, it is "unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source."  42 U.S.C. § 7411(e).

Finally, the Clean Air Act includes a citizen suit provision that allows citizens to request injunctive relief and civil penalties of up to $32,500 per violation per day, payable to the United States Treasury, for the violation of any "emission standard or limitation" under the Act.  42 U.S.C. § 7604(a); *see* 40 C.F.R. § 19.4 (2004).  Citizen suits may be brought against any person "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation" of "any emission standard or limitation" under the Clean Air Act.  *Id.*  Emissions standards or limitations include: (1) any condition or requirement of a permit promulgated under the Clean Air Act, including provisions of state implementation programs, and (2) any new source performance standard promulgated

7

under 42 U.S.C. § 7411.   42 U.S.C. § 7604(f); *Kentucky Res.*
*Council*, 304 F. Supp. 2d at 926.   The Act also authorizes federal
district courts to enforce emission standards or limitations and
to impose appropriate civil penalties.   42 U.S.C. § 7604(a).

### 2.   Louisiana's State Implementation Plan

Louisiana's EPA-approved Clean Air Act implementation plan,
codified at 40 C.F.R. § 52.970, requires a permit for the
discharge of air pollutants.   LA. REV. STAT. ANN. § 30:2055.   The
Secretary of the Louisiana Department of Environmental Quality
issues permits in accordance with federal and state law and LDEQ
regulations.   LA. REV. STAT. ANN. § 30:2054.   Louisiana's
implementation plan prohibits any discharge of "air
contaminants . . . into the air of this state in violation of
regulations of the secretary or the terms of any permit, license,
or variance."   LA. REV. STAT. ANN. § 30:2057.   The plan also
provides that "[n]oncompliance with any term or condition of the
permit shall constitute a violation of this Chapter and shall be
grounds for enforcement action, for permit revision or
termination, or for denial of a permit renewal application."   LA.
ADMIN. CODE tit. 33:III § 501.C.4.   Finally, Louisiana's
implementation plan also incorporates by reference EPA's new
source performance standards, which are codified at 40 C.F.R.
Part 60.   *See* LA. ADMIN. CODE tit. 33:III § 3003.

8

Louisiana's Clean Air Act implementation plan requires regulated entities like Chalmette Refining to file a written report with the LDEQ each time the refinery has an "unauthorized discharge." LA. ADMIN. CODE tit. 33:III § 927. An "unauthorized discharge" is "a continuous, intermittent, or one-time discharge, whether intentional or unintentional, anticipated or unanticipated, from any permitted or unpermitted source which is in contravention of any provision of the Louisiana Environmental Quality Act (R.S. 30:2001, et seq.) or of any permit." LA. ADMIN. CODE tit. 33:I § 3905.

**B.   Benzene Emissions**

**1.   Liability for Alleged Benzene Emissions Violations**

Plaintiffs allege that defendant consistently violates the Clean Air Act by emitting more benzene from its storage tanks than is authorized by its permits. Benzene is classified as a Group A, human carcinogen by the EPA because it is an agent that causes cancer in humans. (See EPA, *Air Toxics Website on Benzene*, at http://www.epa.gov/ttn/atw/hlthef/benzene.html (last updated June 10, 2005)). It is listed in the Clean Air Act as a hazardous air pollutant because it presents a threat of adverse human health effects. 42 U.S.C. § 7412(b)(1), (2).

Defendant operates three benzene storage tanks, identified as D-13001, D-13002, and 200. Permit #2226 (-3) limits emissions

9

from tanks D-13001 and D-13002 to 0.43 tons of benzene per year
per tank and limits hourly benzene emissions from each tank to
0.1 pounds per hour. (Pls.' Mot. Summ. J., Ex. 2 at 3, 4).
Permit #2500-00005-02, which covers tank 200, does not contain an
annual emission limit for benzene but does contain an hourly
emission limit of 0.51 pounds of benzene per hour. (*Id.*, Ex. 1
at 47; Ex. 2 at 9). Under EPA regulations, a mathematical
formula, known as the AP42 factors, is used to calculate
emissions for many types of air pollution sources, including
benzene. (*See* Def.'s Opp. to Pls.' Mot. Summ. J., Ex. A, Aff. of
Claudine Gorman at ¶¶ 3-4). The EPA has recently issued
"clarifications and guidance" on the AP42 factors, which indicate
that the temperature of the liquid in the benzene tanks must be
included in the emissions calculation. (*Id.*).

On July 17, 2003, defendant submitted an initial written
"unauthorized discharge notification report" to the LDEQ
acknowledging a "continuous release of benzene" from its tanks.
(Pls.' Mot. Summ. J., Ex. 3). Defendant stated that "[i]mproved
emissions calculation methods and assumptions indicate that the
normal emissions from these tanks may exceed current permit
limits, which were established using prior emissions estimating
methodologies." (*Id.* at ¶ 4). Defendant estimated that benzene
emissions for the tanks were 51 pounds per day above the LDEQ

10

cumulative permit limits of 17 pounds per day for all three
tanks.  (*Id.* at ¶ 5; *see also* Ex. 4 (providing defendant's
calculation that its tanks exceed daily benzene emissions limits
by 50.7 lbs/day)).  Defendant maintained that the releases were
not preventable, did not result from any specific malfunction,
upset, or emergency condition, and occurred during the normal and
safe operation of the tanks.  (*Id.* at ¶ 13).  Finally, defendant
asserted that "[b]ecause these releases are associated with
normal refinery operations, no incident response or mitigation
has been necessary."  (*Id.* at ¶ 7).

On August 8, 2003, defendant sent an "initial written
notification" letter to the LDEQ to satisfy the continuous
release reporting provisions of 40 C.F.R. § 302.8(e), a
regulation that implements the Comprehensive Environmental
Response, Liability, and Compensation Act.  (Pls.' Mot. Summ. J.,
Ex. 5).  In this written notification, defendant admitted that
the total annual benzene emissions for the year 2002[1] from tank
D-13001 were 5,087 pounds and that the total annual emissions
from tank D-13002 were 5,077 pounds, or approximately 2.54 tons
each.  (*Id.* at 5).  Because the permit for these tanks limits

---

[1] Defendant admitted in its one-year anniversary report,
submitted on August 3, 2004, that the figures presented in the
August 8, 2003 30-day follow-up report covered calendar year 2002
(*id.*, Ex. 6).

11

defendant to 0.43 tons of benzene emissions per year, defendant, by its own admission, emitted almost six times the annual permitted amounts of benzene from tanks D-13001 and D-13002 in 2002. In the written notification, defendant also estimated the upper and lower bounds of its daily benzene emissions for 2002 from tanks D-13001 and D-13002 to be 33 and 13 pounds per day, respectively.[2] (*Id.*). Dividing the daily emissions by 24 to determine hourly emissions demonstrates that, at the least, the tanks each emitted 0.54 pounds per hour of benzene, which is over five times more than the permitted hourly emission level of 0.1 pounds per hour for those two tanks. As for tank 200, defendant estimated that it emitted 9,197 pounds over 2002 and estimated the upper and lower bounds of its daily benzene emissions at 80 and 25 pounds per day, respectively. (*Id.*). Dividing the daily emissions by 24 to determine hourly emissions demonstrates that, at the least, tank 200 emitted 1.04 pounds per hour of benzene in 2002, which is almost twice as much as the hourly limit of 0.51

---

[2] The Court finds that it is appropriate to calculate the hourly excess admissions for all of 2002 based on the upper and lower bound figures Chalmette provided on August 8, 2003. (*Id.*, Ex. 5 at 5). Chalmette admitted in its one-year anniversary report that the figures presented in that 30-day follow-up report covered calendar year 2002. (*Id.*, Ex. 6).

12

pounds per hour.[3]

On August 3, 2004, defendant submitted a one year follow-up report, as required by CERCLA. For the year 2003, defendant admits that the total annual benzene emissions from tank D-13001 were 1,622 pounds, or 0.81 tons, and that the total emissions from tank D-13002 were 1,701 pounds, or 0.85 tons, which are both almost twice as much as the annual permitted amount of 0.43 tons/year. (*Id.*, Ex. 6). Defendant also estimated the upper and lower bounds of its daily benzene emissions from tank D-13001 at 16.85 and 3.88 pounds per day, respectively, and from D-13002 at 18.16 and 4.2 pounds per day, respectively. (*Id.*). Dividing the daily emissions by 24 to determine hourly emissions demonstrates that, at the least, tank D-13001 emitted 0.16 pounds per hour of benzene and tank D-13002 emitted 0.18 pounds per hour in 2003, both over the hourly permitted limit for those tanks of 0.1 pounds per hour. As for tank 200, defendant estimated the upper and lower bounds of daily benzene emissions from that tank at 93.01 and 11.81 pounds per day, respectively. Dividing the daily emissions by 24 to determine hourly emissions demonstrates that

---

[3] For the reasons set forth in n.2, *supra*, the Court again finds that it is appropriate to calculate the hourly excess admissions for tank 200 for all of 2002 based on the upper and lower bound figures Chalmette provided on August 8, 2003. (*Id.*, Ex. 5 at 5).

tank 200 emitted somewhere between 0.49 pounds per hour, which is just less than the hourly limit of 0.51 pounds per hour, and 3.87 pounds per hour, which is more than six times the permitted hourly level of emissions.

Plaintiffs have demonstrated that these admitted-to amounts of benzene emissions regularly exceeded defendant's annual and hourly permit limits for all three tanks and, therefore, resulted in numerous violations of defendant's permits. (See Pls.' Mot. Summ. J. at 12-14). Based on this evidence, plaintiffs request that the Court issue summary judgment in its favor on defendant's liability for these violations. The Court has already concluded that unauthorized discharge reports such as those at issue here are competent evidence to demonstrate that defendant violated emissions standards or limitations promulgated under the Clean Air Act and Louisiana's state implementation plan. See St. Bernard Citizens for Envtl. Quality, Inc., 354 F. Supp. 2d at 707 (citing authorities). Nevertheless, defendant argues that the Court should essentially ignore these clearly established permit violations because the LDEQ has declared that the reported violations are not actually violations.

Defendant first relies on the LDEQ's recognition that, for some facilities, the clarification of the AP42 factors will "result in a change in the calculation of emissions from levels

14

that were previously in compliance with permit limits to levels that exceed" their permit limits.  (Def.'s Opp. to Pls.' Mot. Summ. J., Ex. C).  The LDEQ has also noted that, with the change in the factors, some facilities "may now be reporting emissions that exceed permit limits, even though their actual emissions have not changed," and that, as a result, those facilities "face potential enforcement actions, including substantial civil penalties."  (*Id.*).  Because facilities might elect to reduce or cease operations as a result, "which would have severe economic consequences for the firms involved, as well as their employees, suppliers, and customers," the LDEQ issued Emergency Rule AQ240E, which is codified at LA. ADMIN. CODE tit. 33:III § 501.C.11.  The rule declares that "[e]missions increases due solely to a change in AP42 factors do not constitute violations of the air permit." LA. ADMIN. CODE tit. 33:III § 501.C.11.  Accordingly, if defendant's violations of its benzene permit limits are due solely to a change in AP42 factors, the LDEQ has declared that they are not in fact violations of the permit.[4]

Putting aside that defendant has not shown that this rule applies to its situation, *i.e.*, that its violations are "due solely to a change in AP42 factors," *see* discussion *infra* Part

---

[4] The LDEQ appears to have renewed this emergency rule as of April 27, 2005.  (Def.'s Opp. to Pl.'s Mot. Summ. J., Ex. C).

15

III.B.2, as a matter of federal law, the LDEQ may not revise
Louisiana's EPA-approved implementation plan by declaring that
certain permit violations are not in fact permit violations
without approval from the EPA.  Under 40 C.F.R. § 51.05,
"[r]evisions of a plan, or any part thereof, will not be
considered part of an applicable plan until such revisions have
been approved by the Administrator."  Furthermore, 42 U.S.C.
§ 7416 provides that "if an emission standard or limitation is in
effect under an applicable implementation plan . . . [states] may
not adopt or enforce any emissions standard or limitation which
is less stringent than the standard or limitation under such
plan."  As a proposed revision to Louisiana's implementation
plan, Rule AQ240E has "no legal weight until it is finally
approved" by the EPA.  *Duquesne Light Co. v. EPA*, 698 F.2d 456,
472 (D.C. Cir. 1983); *see Sweat*, 200 F. Supp. 2d at 1170 (state's
implementation plan remains enforceable while a revision proposal
is pending; "EPA has final authority to approve revisions of EPA-
approved" state implementation plans) (citing *Gen. Motors Corp.
v. United States*, 496 U.S. 530, 540 (1990)); *Clean Air Council v.
Mallory*, 226 F. Supp. 2d 705, 722 (E.D. Pa. 2002) ("There can be
no doubt that the existing SIP remains the 'applicable
implementation plan' even after the state has submitted a
proposed revision.").  Because there is no evidence that Rule

16

AQ240E has been approved by the EPA, it is not a valid and enforceable part of Louisiana's implementation plan, and it does not change defendant's permit limits for benzene emissions.

Defendant also relies on an "Administrative Order of Consent" that it has entered with the LDEQ.  Defendant asserts that this order sweepingly "establishes new interim emissions limitations and monitoring and reporting requirements for the facilities at the refinery."  (Def.'s Mot. to Supp. Opp. to Pls.' Mot. for Summ. J., Second Gorman Aff. at ¶ 4).  The Court, however, finds that the AOC does not revise defendant's permit and simply reflects the LDEQ's current enforcement intentions. The AOC requires defendant to submit updated Clean Air Act Title V permit applications and provides that, "[u]ntil such time as the Department takes final action on the . . . permit applications, or otherwise notifies Chalmette Refining, Chalmette Refining shall operate its emission sources in compliance with the interim emission limitations and monitoring and reporting requirements set forth in Appendix A."  (*Id.*, Ex. A at ¶ IV). Appendix A includes an emissions limit of 1,032.5 tons per year for all of the tanks at the refinery, including the benzene tanks.  Defendant asserts that this overall limitation is sufficient to cover all of its current emissions from the benzene tanks.  (Def.'s Mot. to Supp. Opp. to Pls.' Mot. for Summ. J.,

17

Second Gorman Aff. at ¶ 6; Hammatt Aff. at ¶ 6). Significantly, the AOC does not purport to be a revision of defendant's current permits. Indeed, it expressly contemplates that the permit application and revision process will occur in the future. The order represents no more than an understanding between the LDEQ and defendant that the LDEQ will forgo enforcing defendant's permit limits while defendant procures a new permit. Such representations by officials that a permit will not be enforced, without formal modification in the permit, "will not excuse the holder from the terms of that permit." *See Yates*, 757 F. Supp. at 445. Accordingly, there is no reason for the Court to construe the AOC as a permit revision that would foreclose defendant's liability here.

Defendant has not challenged plaintiffs' calculation of the amounts or numbers of violations on which plaintiffs seek summary judgment. Instead, the upshot of defendant's argument is that the benzene permit limit violations do not actually reflect excessive emissions of benzene. Defendant argues that these violations are, rather, an anomaly that has resulted from a clarification in the AP42 factors used to calculate benzene emissions. In essence, defendant argues that the clarified formula caused its emission numbers to go over permit limits even though the actual amount of benzene emitted would have satisfied

18

its permit requirements under the old formula.  Defendant has
cited no authority for the proposition that plaintiffs may not
sue under the Clean Air Act for permit violations that are
reported because the method of calculating emissions has changed.
Rather, the import of the relevant authority appears to be to the
contrary, as courts regularly reject efforts by defendants to
rationalize permit violations under federal environmental laws.
For example, in *California Pub. Interest Research Group v. Shell
Oil Co.*, the Court rejected defendant's argument that the limit
in its Clean Water Act permit did not fairly represent its
performance and therefore should have been set at a higher level
at the time the permit was issued.  840 F. Supp. 712, 714-15, 718
(N.D. Cal. 1993); *see also United States v. City of Toledo*, 867
F. Supp. 598, 602 (N.D. Ohio 1994) (rejecting defendant's
argument that it did not violate its Clean Water Act permit
because it self-reported inaccurate values); *Public Interest
Research Group of New Jersey v. Yates Indus., Inc.*, 757 F. Supp.
438, 445 (D.N.J. 1991) (rejecting defense based on enforcement
agency's assertion to defendant that it would not enforce certain
permit parameters because "the fact remains that defendant's
[Clean Water Act] permit contains parameter restrictions for [its
polluting source], and that defendant has violated those
parameters"); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608

19

F. Supp. 440, 452 (D. Md. 1985) (rejecting defense of inaccurate monitoring and noting that Congress intended to base enforcement on reporting requirements when it passed the Federal Water Pollution Control Act); *Student Public Interest Group v. Tenneco Polymers, Inc.*, 602 F. Supp. 1394, 1400 (D.N.J. 1985) (rejecting defense of inaccurate monitoring in Federal Water Pollution Control Act case).

When it decides whether permit violations have occurred, the Court is thus "not called upon to itself delve into the complex questions of what quantities of pollutants are safe or what various industries can be expected to accomplish in reducing pollution." *Chesapeake Bay Found.*, 608 F. Supp. at 452 (citation omitted). Arguments about the substantive content of the permit should be submitted to the agency when the permit is issued or in a request for a modification, and they are not appropriate defenses in an enforcement action. *See Nat'l Resources Def. Council, Inc. v. Outboard Marine Corp.*, 692 F. Supp. 801, 821 (N.D. Ill. 1988) (holding that defendant "cannot contest the substantive restrictions of [a Clean Water Act] permit in an enforcement action"). In an enforcement action, "[a]ll the Court here is called upon to do is compare the allowable quantities of pollution listed in the permits with the available statistics on actual pollution." *Chesapeake Bay Found.*, 608 F. Supp. at 452

(citation omitted); *see also Pub. Interest Research Group of New Jersey, Inc. v. Rice*, 774 F. Supp. 317, 325 (D.N.J. 1991) (in Clean Water Act case, "[a] violation of a permit limitation by a discharger is an automatic violation of the Act"). Strict enforcement of applicable permits is in accordance with the legislative history of the Clean Air Act, which "plainly reflects a congressional intent that claims of technological and economic infeasibility not constitute a defense to an adjudication of violation of applicable" Clean Air Act requirements. *Friends of the Earth v. Potomac Elec. Power Co.*, 419 F. Supp. 528, 535 (D.D.C. 1976). The Court has found no basis on which defendant may be excused from its reported violations of the benzene emissions limits in its permits. Plaintiffs are therefore entitled to summary judgment on defendant's liability for the benzene emissions. This does not mean, however, that defendant's argument that the reported violations do not in fact represent an increased level of benzene emissions is completely irrelevant to these proceedings. This argument could bear on the propriety of granting injunctive relief in this case.

**2. Injunctive Relief for Benzene Emissions Violations**

Plaintiffs seek an injunction that prohibits defendant from violating its permit limits for emissions of benzene. The Court applies traditional equitable principles to determine whether to

21

issue a preliminary or permanent injunction to remedy violations
of an environmental statute.  *See Amoco Prod. Co. v. Village of
Gambell, Alaska*, 480 U.S. 531, 542 (1987) (reviewing "well-
established principles governing the award of equitable relief"
in injunction action under environmental statute).  To obtain
permanent injunctive relief, plaintiffs must show: 1) actual
success on the merits; 2) the inadequacy of legal remedies; and
3) irreparable harm if the relief is not granted.  *Natural Res.
Def. Council, Inc. v. Texaco Ref. and Mktg., Inc.*, 2 F.3d 493,
506 (3d Cir. 1993); *Yates*, 757 F. Supp. at 453.  The Court must
also balance the competing claims of injury and the public
interest to determine whether injunctive relief for environmental
permit violations is appropriate.  *Natural Res. Def. Council,
Inc. v. Texaco Ref. and Mktg., Inc.*, 906 F.2d 934, 937-40 (3d
Cir. 1990) (citing *Amoco Prod. Co.*, 480 U.S. at 544-47).  The
Court's balancing of the interests in environmental cases like
this one should give "particular regard" to the public interest.
*Amoco Prod. Co.*, 480 U.S. at 542; *see also Potomac Elec. Power
Co.*, 419 F. Supp. at 535 (holding that court "must give dominant
weight to the public health interests protected by the [Clean
Air] Act").

The Court finds that the intervention of Hurricane Katrina
could potentially alter the legal and equitable landscape on the

22

issue of granting injunctive relief.  Accordingly, the Court orders the parties to brief this issue within 15 days of the issuance of this order.

### C.   Sulfur Dioxide Emissions

Plaintiffs also request summary judgment on their allegations that defendant repeatedly violates its permitted sulfur dioxide limits.  Defendant's refinery has two flares that, when operating properly, incinerate hydrogen sulfide and convert it to sulfur dioxide.[5]  The flares are known as No. 1 and No. 2. Under Permit #2500-0005-02, the maximum sulfur dioxide emission rate for both flares is 2.13 pounds per hour.  (Pls.' Mot. Summ. J., Ex. 1 at App. A).

On October 14, 2002, defendant notified the LDEQ that from September 1, 2001 through August 31, 2002, it continuously released sulfur dioxide from the two flares in excess of 500 pounds per day.  (*Id.*, Ex. 7).  Defendant admitted that the release was "not related to any upset or emergency condition." (*Id.*).  Rather, it asserted that the release was a result of a routine refinery operation known as a "coker blowdown," a

---

[5] Both sulfur dioxide and hydrogen sulfide are hazardous gases with a pungent odor often described as similar to rotten eggs and burnt matches.  *Texans United for a Safe Economy Educ. Fund*, 207 F.3d at 791 n.6.  The EPA has listed sulfur dioxide and hydrogen sulfide as extremely hazardous substances.  40 C.F.R. Pt. 355, App. A.

23

periodic discharge of sulfur-containing compounds to flares that convert those compounds to sulfur dioxide which is released to the atmosphere. (*Id.*). In a follow-up report submitted on November 13, 2002, defendant confirmed that the release of sulfur dioxide for that period of time from flare No. 1 was between 5,045 and 16,642 pounds per day, and that the release of sulfur dioxide from flare No. 2 was between 2,318 and 12,503 pounds per day. (*Id.*, Ex. 8). Even if the lower bound of the sulfur dioxide emissions is spread over the entire day to calculate the average hourly emission, the result is that flare No. 1 emitted an average of 210 pounds of sulfur dioxide per hour during the period from September 1, 2001 through August 31, 2002 and that flare No. 2 emitted an average of 96 pounds per hour of sulfur dioxide for the same period, all well in excess of the permitted 2.13 pounds per hour. Plaintiffs also provide evidence that defendant has admitted to violating the annual maximum emissions rates for both flares.

Defendant does not produce evidence that it did not commit these violations, nor does it challenge plaintiffs' method of calculating the number of violations. Rather, defendant asserts that the "coker blowdown" emissions that it reported resulted from start-up and shut-down of the coker units and therefore constituted "process upset gas," which is exempt from regulation.

24

*See* 40 C.F.R. §§ 60.101(e); 60.104(a)(1).  "Process upset gas" is
defined as "any gas generated by a petroleum refinery process
unit as a result of start-up, shut-down, upset or malfunction."
40 C.F.R. § 60.101(e).  Although 40 C.F.R. § 60.104(a)(1)
prohibits the burning of fuel gas that contains in excess of 230
mg/dscm, it exempts "[t]he combustion in a flare of process upset
gases or fuel gas that is released to the flare as a result of
relief valve leakage or other emergency malfunctions."  40 C.F.R.
§ 60.104(a)(1).  Defendant asserts that "coker blowdown" produced
sulfur dioxide emissions that qualify as process upset gas that
is exempt from sulfur dioxide emissions standards under 40 C.F.R.
§ 60.104(a)(1).  The problem with this argument is that, when
defendant reported the sulfur dioxide emissions, it admitted that
they were not related to any upset or emergency condition.  Even
if the sulfur dioxide emissions that resulted from "coker
blowdown" are process upset gas, the plain language of 40 C.F.R.
§ 60.104(a)(1) indicates that the only type of incident that is
exempt from emissions requirements is the combustion of gases
that are released to the flare as a result of "emergency
malfunctions."  *Id.*  Because defendant admitted that the sulfur
dioxide emissions it reported were not related to any emergency
condition, those emissions are not exempt from emissions limits
under the plain language of the regulation.

Defendant also argues that it has already started to install a flare gas recovery unit that "will significantly reduce, if not eliminate, the emission of sulfur dioxide associated with start-up and shut-down of the cokers." (Def.'s Opp. Pls.' Mot. Summ. J., Ex. A at ¶ 13). And defendant suggests that the Administrative Order on Consent sets interim emissions limits for sulfur dioxide that, defendant asserts, are "sufficient to cover all sulfur dioxide emissions from the coker units as they currently exist," even before the flare gas recovery unit is installed. (Def.'s Mot. to Supp. Opp. to Pls.' Mot. for Summ. J., Second Gorman Aff. at ¶¶ 8-9). This evidence does not address defendant's liability for the past violations of sulfur dioxide permit limits and the violations that are likely to continue to occur until the flare gas recovery unit is actually installed or new permits are actually in place. Even if defendant eventually comes into compliance with some future permit limit on sulfur dioxide emissions, post-complaint compliance does not moot plaintiffs' claim for civil penalties. *See Anderson v. Farmland Indus, Inc.*, 70 F. Supp. 2d 1218, 1235 (D. Kan. 1999) (citing authorities); *cf. Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1065 n.9 (5th Cir. 1991) (noting in dicta that other circuits have decided that "compliance with the [Clean Water] Act subsequent to filing the complaint does not

26

moot a citizen's action for civil penalties").  Accordingly, the
Court grants summary judgment for plaintiffs on their claims
relating to defendant's violations of its sulfur dioxide permit
emissions limits.

### D.  Violations of New Source Performance Standards for Flares

Finally, plaintiffs request summary judgment on their
allegations that defendant regularly violates new source
performance standards by (1) failing to operate the two flares
with a flame at all times, and (2) failing to monitor its flames
consistently.  The new source performance standards for flares at
40 C.F.R. Part 60, Subpart J, apply to defendant's No. 1 and No.
2 flares.  (Pls.' Mot. Summ. J., Ex. 1 at 10, ¶ 2).  These
regulations require defendant to operate its flares "with a flame
present at all times as determined by the methods specified in
paragraph (f)," that is, "using a thermocouple or any other
equivalent device to detect the presence of a flame."  40 C.F.R.
§ 60.18(c)(2), (f)(2).  Defendant must also monitor the flares
continuously "to ensure that they are operated and maintained in
conformance with their designs," *i.e.*, that they are operating
with a flame present at all times.  40 C.F.R. § 60.18(d).

Defendant has admitted that on 579 occasions from July 15,
1999 to July 15, 2004, the flare monitoring devices were working

and reported that the pilot flame for one or the other of the flares was extinguished, which resulted in the release of hydrogen sulfide and violated the requirement of 40 C.F.R. § 60.18(c)(2) that the flares be operated with a flame present at all times. (Pls.' Mot. Summ. J., Exs. 10-20). Although defendant points out that the flare was actually extinguished on only six of these occasions, the monitoring devices' repeated failure to detect the presence of the flame nevertheless violates the requirement that a monitoring device establish the presence of a flame. 40 C.F.R. § 60.18(c)(2), (f)(2).

Defendant has also admitted that the flare pilot monitoring devices were *not* working on 241 occasions between July 15, 1999 and July 15, 2004. (*Id.*). These malfunctions of the monitoring equipment violate the requirement of 40 C.F.R. § 60.18(d) that defendant ensure that the flares are operated and maintained in conformity with their design and the regulation of 40 C.F.R. § 60.18(f)(2) that defendant do so using a thermocouple or other equivalent monitoring device.

Defendant does not produce evidence that it did not in fact commit these violations, nor does it challenge plaintiffs' method of calculating the number of violations. (Def.'s Opp. to Pls.' Mot. Summ. J. at 12). Instead, it contends that it continuously monitors for the presence of the pilot flame with visual

28

observation or video monitoring, as well as the thermocouple device, so that the pilot flame is monitored even when the thermocouple device is not working. (Def.'s Opp. to Pls.' Mot. Summ. J., Ex. E at ¶¶ 3-5). Defendant argues that the monitoring violations do not result in any environmental impact when backed up by visual and video monitoring that confirms the presence of the pilot flame and that plaintiffs therefore are not entitled to summary judgment on the "technical" violations of the monitoring requirements.

The Court finds that plaintiffs are entitled to summary judgment on all of the alleged violations that relate to the operation of the pilot flames for the flares. Defendant does not even attempt to argue that the six times the flames were extinguished do not constitute violations of 40 C.F.R. § 60.18(c)(2). As for the violations that defendant characterizes as "technical," defendant does not argue that monitoring the pilot flames by visual observation or by video complies with the requirement that flares be monitored "using a thermocouple or any other equivalent device." 40 C.F.R. § 60.18(f)(2). Rather, defendant asserts that its monitoring violations should be excused because the presence of visual and video monitoring can confirm that the flame is present and that the monitoring violations are therefore not impacting the

29

environment.  The regulations that defendant violated, however,

prohibit all monitoring violations and makes no distinction based

on whether the violations impact the environment.  Accordingly,

the Court grants summary judgment in plaintiffs' favor with

respect to its allegations concerning the presence and monitoring

of the pilot flames at the No. 1 and No. 2 flares.

### E.    Ongoing Enforcement

Defendant's final argument is that the Court should consider

the effect of ongoing enforcement actions by the LDEQ.  The Court

is not persuaded that it should reexamine its prior ruling

regarding the effect of administrative enforcement actions on

this citizen suit proceeding.  *See St. Bernard Citizens for*

*Envtl. Quality, Inc.*, 348 F. Supp. 2d at 768.  The only change in

circumstances that has occurred since the Court's earlier ruling

is that defendant has entered into an Administrative Consent

Order with the LDEQ that purports to set interim emissions limits

at levels that are apparently high enough to encompass

defendant's current emissions.  The Court has already determined

that the AOC did not revise defendant's permits, and the AOC does

not undermine the basis for this Court's summary judgment on

violations that defendant has already committed and that were

ongoing at the time plaintiffs filed their complaint.  *See id.*

Civil penalties for the violations defendant has committed are

appropriate to the extent that they will deter defendant from violating its permit limits. *Cf. Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000) (defendant asserting mootness "bears the formidable burden of showing that is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"). Accordingly, the Court finds that ongoing administrative enforcement action does not warrant a denial of summary judgment in plaintiffs' favor.

The Court will determine the appropriate civil penalties remedy for the violations on which the Court has granted summary judgment in a future proceeding.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS plaintiffs' partial motion for summary judgment as to defendant's liability for violations of benzene and sulfur dioxide emissions limits in its permits and as to defendant's liability for violations of new source performance standards that apply to its flares.

The Court will defer ruling on plaintiff's request for injunctive relief as to defendant's permit violations until the parties have briefed the impact, if any, of Hurricane Katrina on the propriety of an injunction. The Court ORDERS the parties to brief this issue within 15 days of the date of this order.

31

New Orleans, Louisiana, this 14ᵗʰ day of ~~August~~ October, 2005.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE