UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ST. BERNARD CITIZENS FOR                CIVIL ACTION
ENVIRONMENTAL QUALITY, INC.,
AND LOUISIANA BUCKET BRIGADE

VERSUS                                  NO.  04-0398

CHALMETTE REFINING, L.L.C.              SECTION "R" (1)

## ORDER AND REASONS

Plaintiffs St. Bernard Citizens for Environmental Quality, Inc. and Louisiana Bucket Brigade move for partial summary judgment on defendant's liability for additional violations of the Clean Air Act.  Defendant Chalmette Refining, L.L.C. opposes plaintiffs' motion and has filed its own motion for summary judgment in light of the consent decree recently entered into between defendant, the United States Environmental Protection Agency, and the Louisiana Department of Environmental Quality. For the following reasons, the Court GRANTS in part and DENIES in part plaintiffs' motion for summary judgment on liability and GRANTS defendant's cross-motion.

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiffs are nonprofit corporations formed to address environmental issues in St. Bernard Parish and in Louisiana. This is now the third motion for partial summary judgment brought by plaintiffs against Chalmette Refining.  This litigation commenced on February 12, 2004, and then by amended complaint on February 20, 2004, when plaintiffs sued Chalmette Refining under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a), and the citizen suit provision of the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11046(b)(1).  Plaintiffs allege in their complaint that Chalmette Refining has violated and continues to violate (1) hourly permit emission limits for various harmful pollutants, (2) flare performance standards and monitoring requirements, (3) benzene emission limits for its storage tanks, (4) State reporting requirements for "unauthorized discharges" of pollutants and (5) EPCRA reporting requirements.  Plaintiffs assert that these violations endanger the health and damage the quality of life of their members who live near defendant's refinery.  Plaintiffs' complaint requests a declaration that defendant has committed these violations, an injunction requiring it to cease the violations, civil penalties and attorney's fees. 42 U.S.C. § 7604(g).

2

On May 18, 2004, plaintiffs filed a motion for partial summary judgment on two issues.  First, plaintiffs requested summary judgment on defendant's liability for 34 violations of its emissions permits, including eight violations of flare performance standards, 17 unauthorized discharges of oil, and nine unauthorized discharges of pollutants.  Second, plaintiffs requested summary judgment on the issue of standing, arguing that members of their organizations suffered an injury that is fairly traceable to defendant's unauthorized discharges and that is redressable by the Court.

On June 23, 2004, by stipulation of the parties, the case was stayed until August 20, 2004 to facilitate settlement negotiations. The case was stayed again twice, with the final stay expiring on September 27, 2004.  On September 27, 2004, defendant moved to stay the matter for 180 days, arguing that the Louisiana Department of Environmental Quality had initiated administrative enforcement actions and permit negotiations that would likely remedy the violations at issue in the lawsuit.  The Court found that a discretionary exercise of its power to stay was inappropriate.  *See St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 348 F. Supp. 2d 765, 767-69 (E.D. La. 2004).  Although the Court denied defendant's request for a stay, it granted its alternative request for a continuance of

3

plaintiffs' summary judgment motion.  On February 3, 2005, the
Court granted plaintiffs' first motion for partial summary
judgment on standing and on liability for the 34 discharges.  *See
St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref.*,
354 F. Supp. 2d 697, 701-06 (E.D. La. 2005).

On April 26, 2005, plaintiffs moved for partial summary
judgment on defendant's liability for an additional 2,629 alleged
violations of the Clean Air Act.  The alleged violations
consisted of (1) 1,273 violations of permit limits on emissions
of benzene from the refinery's two benzene tanks since 2003; (2)
536 violations of permit limits on emissions of sulfur dioxide
from the refinery's flares since 2002; and (3) 820 violations of
"new source performance standards" for flares and monitoring of
flares since 1999.  Because defendant's benzene tanks allegedly
exceeded its permit limits for benzene emissions on a consistent
basis, plaintiffs also requested that the Court issue an
injunction ordering defendant either to conform its operation of
the benzene tanks to its permit limits or to close them within 30
days.

After plaintiffs filed their second partial summary judgment
motion, defendant entered an Administrative Consent Order with
the LDEQ, effective May 24, 2005.  The order required defendant
to submit updated Clean Air Act permit applications.  (R. Doc.

4

66, Second Aff. of Claudine Gorman at ¶ 4).  The order also stated that, "[u]ntil such time as the Department takes final action on the . . . permit applications, or otherwise notifies Chalmette Refining, Chalmette Refining shall operate its emission sources in compliance with the interim emission limitations and monitoring and reporting requirements set forth in Appendix A." (*Id*. at ¶ 5).

On October 14, 2005, the Court granted plaintiffs' second motion for partial summary judgment on defendant's liability for the benzene emissions, the sulfur dioxide emissions, and the violations of the "new source performance standards" for flares and monitoring of flares.  *See St. Bernard Citizens for Envtl. Quality, Inc*. *v. Chalmette Ref.*, 399 F. Supp. 2d 726 (E.D. La. 2005).  The Court deferred ruling at that time on plaintiffs' request for injunctive relief as to defendant's benzene emission violations in light of the devastation wrought by Hurricane Katrina in St. Bernard Parish.  *Id*. at 736-37.  On November 7, 2005, the parties agreed to a joint stipulation, made effective January 1, 2006, in which defendant "shall ensure that emissions from the benzene tanks do not exceed" the permit limits and "shall promptly report any violation of this order to the Court." (R. Doc. 79).  The parties then requested, and were granted, a series of Orders that effectively stayed this litigation from

November 2005 until January 2007, when the Court entered a modified scheduling order at the request of the parties. (R. Doc. 99).

Plaintiffs now move for partial summary judgment on defendant's liability for 50 further violations of the Clean Air Act. Concurrently, defendant moves for summary judgment on the ground that plaintiffs' new claims, as well as any future claims arising from their complaint, are barred by the principles of *res judicata* and collateral estoppel because both the EPA and the LDEQ have entered into consent decrees with the defendant in federal and state court, respectively, since the Court ruled on plaintiffs' second partial motion for summary judgment. The Court heard oral argument on plaintiffs' and defendant's motions and considered the briefs of the parties. The Court rules as follows.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To grant summary judgment, the Court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that

6

the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The moving party bears the burden of establishing that there are no genuine issues of material fact. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322-25).  To do so, it may simply point out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim or defense. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must set out specific facts showing that a genuine issue exists by submitting or referring to evidence already in the record, not resting upon mere allegations in the pleadings.  *See Triple Tee Golf*, 485 F.3d at 261 (citing *Celotex*, 477 U.S. at 321-25; *Anderson*, 477 U.S. at 255-57).

III. DISCUSSION

    A.    **Applicable Law**

        1.    **The Clean Air Act**

Congress created the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, is a comprehensive program for controlling and improving the nation's air quality. Under the Act, the Environmental Protection Agency identifies air pollutants that endanger the public health or welfare, determines the concentrations of those pollutants that are safe and promulgates those determinations as national ambient air quality standards. *See* 42 U.S.C. §§ 7408, 7409. Each state must ensure that its ambient air meets the appropriate NAAQS, *see* 42 U.S.C. § 7407(a), and must develop a state implementation plan to achieve the standards established by the EPA. *See* 42 U.S.C. § 7410(a). The Act requires state implementation plans to include "enforceable emission limitations and other control measures, means, or techniques . . . as well as schedules and timetables for compliance" to meet the NAAQS. 42 U.S.C. § 7410(a)(2)(A). Upon approval by the EPA, the state implementation plan becomes federally enforceable. *Louisiana Envtl. Action Network v. EPA*, 382 F.3d 575, 579 (5th Cir. 2004); *Kentucky Res. Council, Inc. v.*

*EPA*, 304 F. Supp. 2d 920, 923 (W.D. Ky. 2004); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1164 (D. Ariz. 2001).  For entities regulated under the Clean Air Act, "[t]he burden is clearly on the source to do whatever is necessary to assure compliance."  45 Fed. Reg. 59,874, 59,877 (Sept. 11, 1980).

The Clean Air Act also requires the EPA to develop new source performance standards to govern emissions of air pollutants from facilities that are constructed or modified after the publication of regulations.  42 U.S.C. § 7411(a)(2), (f).  After the EPA promulgates new source performance standards, it is "unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source."  42 U.S.C. § 7411(e).

Finally, the Clean Air Act includes a citizen suit provision that allows citizens to request injunctive relief and civil penalties of up to $32,500 per violation per day, payable to the United States Treasury, for the violation of any "emission standard or limitation" under the Act.  42 U.S.C. § 7604(a); *see* 40 C.F.R. § 19.4 (2004).  Citizen suits may be brought against any person "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation" of "any emission standard or limitation" under the Clean Air Act.  *Id*.  Emissions standards or limitations include:

9

(1) any condition or requirement of a permit promulgated under the Clean Air Act, including provisions of state implementation programs, and (2) any new source performance standard promulgated under 42 U.S.C. § 7411.  42 U.S.C. § 7604(f); *Kentucky Res. Council*, 304 F. Supp. 2d at 926.  The Act also authorizes federal district courts to enforce emission standards or limitations and to impose appropriate civil penalties.  42 U.S.C. § 7604(a).

### 2.   Louisiana's State Implementation Plan

Louisiana's EPA-approved Clean Air Act implementation plan, codified at 40 C.F.R. § 52.970, requires a permit for the discharge of air pollutants.  LA. REV. STAT. ANN. § 30:2055.  The Secretary of the Louisiana Department of Environmental Quality issues permits in accordance with federal and state law and LDEQ regulations.  LA. REV. STAT. ANN. § 30:2054.  Louisiana's implementation plan prohibits any discharge of "air contaminants . . . into the air of this state in violation of regulations of the secretary or the terms of any permit, license, or variance."  LA. REV. STAT. ANN. § 30:2057.  The plan also provides that "[n]oncompliance with any term or condition of the permit shall constitute a violation of this Chapter and shall be grounds for enforcement action, for permit revision or termination, or for denial of a permit renewal application."  LA. ADMIN. CODE tit. 33:III § 501.C.4.  Finally, Louisiana's

10

implementation plan also incorporates by reference EPA's new source performance standards, which are codified at 40 C.F.R. Part 60. *See* LA. ADMIN. CODE tit. 33:III § 3003.

Louisiana's Clean Air Act implementation plan requires regulated entities like Chalmette Refining to file a written report with the LDEQ each time the refinery has an "unauthorized discharge." LA. ADMIN. CODE tit. 33:III § 927. An "unauthorized discharge" is "a continuous, intermittent, or one-time discharge, whether intentional or unintentional, anticipated or unanticipated, from any permitted or unpermitted source which is in contravention of any provision of the Louisiana Environmental Quality Act (R.S. 30:2001, *et seq.*) or of any permit." LA. ADMIN. CODE tit. 33:I § 3905.

**B.   Defendant's Alleged Violations of the Clean Air Act**

Plaintiffs move for summary judgment on 50 preventable, unauthorized discharges of regulated air pollutants reported by defendant since April 15, 2003. Defendant does not contest that the discharges, which were documented in written reports filed with the LDEQ, occurred and were preventable. The incidents that comprise the subject of plaintiffs' motion are as follows:

- On April 15-21, 2003, Chalmette Refining had a total of seven unauthorized and preventable discharges of 165 lbs of benzene.

11

- On May 3-5, 2003, Chalmette Refining had a total of 15 unauthorized, preventable discharges of 52.78 lbs of benzene, 4.94 lbs of ethylbenzene, 368.19 lbs of hexane, 90.78 lbs of toluene, and 32.02 lbs of mixed xylenes.

- On October 4, 2003, Chalmette Refining had two unauthorized, preventable discharges of 116 lbs of hydrogen sulfide and 2,744 lbs of volatile organic compounds.

- On March 4, 2004, Chalmette Refining had two unauthorized, unpermitted, and preventable discharges of 203 lbs of benzene and 33,832 lbs of volatile organic compounds, from over pressurization of the No. 1 Prefractionator Tower venting from the No. 1 Prefractionator Pressure Safety Valve.

- On April 14, 2004, Chalmette Refining had one unauthorized, preventable discharge of 14,307 lbs of volatile organic compounds.

- On July 7, 2004, Chalmette Refining had one unauthorized, preventable discharge of 33 lbs of nitric oxide.

- On August 19, 2004, Chalmette Refining had two unauthorized, preventable discharges of 29,304 lbs of

sulfur dioxide and 62.5 lbs of nitric oxide.

- On December 11, 2004, Chalmette Refining had two unauthorized, preventable discharges of 2,888 lbs of sulfur dioxide and 39 lbs of nitric oxide.

- On January 7, 2005, Chalmette Refining had three unauthorized, unpermitted, and preventable discharges of 2,544 lbs of volatile organic compounds, 22 lbs of volatilized benzene, and 181 lbs of xylenes.

- On February 7, 2005, Chalmette Refining had two unauthorized, preventable discharges of 90 lbs of nitric oxide and 10 lbs of nitrogen dioxide.

- On July 17, 2005, Chalmette Refining had one unauthorized, preventable discharge of 22 lbs of nitric oxide.

- On October 13, 2005, Chalmette Refining had one unauthorized, preventable discharge of 4,800 lbs of volatile organic compounds.

- On June 21, 2006, Chalmette Refining had two unauthorized, preventable discharges of 22 lbs of nitric oxide and 2,287 lbs of sulfur dioxide.

- On September 6, 2006, Chalmette Refining had two unauthorized, preventable discharges of 36 lbs of nitric oxide and 800 lbs of sulfur dioxide.

13

- On September 8, 2006, Chalmette Refining had one unauthorized, preventable discharge of 14.42 lbs of nitric oxide.

- On October 17, 2006, Chalmette Refining had two unauthorized, preventable discharges of 30 lbs of nitric oxide and 8,293 lbs of sulfur dioxide.

- On December 4, 2006, Chalmette Refining had one unauthorized, preventable discharge of 1,946 lbs of sulfur dioxide.

- On December 8, 2006, Chalmette Refining had one unauthorized, preventable discharge of 2,988 lbs of sulfur dioxide.

- On February 3, 2007, Chalmette Refining had one unauthorized, preventable discharge of 784 lbs of sulfur dioxide.

(R. Doc. 104-3).

While conceding these facts, defendant nevertheless contends that liability for the above-listed incidents under the Clean Air Act is foreclosed.  First, defendant argues that, for all but three of these incidents, plaintiffs failed to satisfy the Clean Air Act's notice requirement.  *See* 42 U.S.C. § 7604(b)(1)(A).[1]

---

[1] In their reply to defendant's opposition to their partial motion for summary judgment, plaintiffs concede that they

14

Second, defendant contends that any violations that occurred after April 26, 2006, when the defendant entered into a consent decree with the EPA and LDEQ, are not properly part of this case because the plaintiffs are required to submit new notice letters before filing suit for post-consent decree violations.  Finally, defendant asserts that plaintiffs are not entitled to any further relief in this litigation because the consent decrees entered into by the defendant, EPA, and LDEQ fully and adequately cover the above-listed violations, and thus bar plaintiffs under the doctrines of *res judicata* and collateral estoppel from bringing their summary judgment motion.  Before reaching the merits of the parties' arguments, the Court first discusses the settlements that defendant reached with the EPA and the LDEQ.

**C.   The EPA Consent Decree and the LDEQ Settlement**

On October 11, 2005, more than a year after plaintiffs initiated their action against Chalmette Refining, the United States of America, acting at the request of the EPA and the State of Louisiana, on behalf of the people of Louisiana and the LDEQ, filed suit in the Eastern District of Louisiana against Chalmette

---

"arguably may not have provided adequate notice" of the incidents that occurred on March 4, 2004 and January 7, 2005.  They therefore have withdrawn their request for summary judgment as to liability for these two incidents, while arguing that the remaining alleged violations were properly noticed.  (R. Doc. 120).

Refining under the Clean Air Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Emergency Planning and Community Right-to-Know Act and the Louisiana Environmental Quality Act. (*See* Civ. Action No. 05-4662, R. Doc. 1).  On February 7, 2006, the parties submitted a consent decree to the court, which The Honorable Ivan L.R. Lemelle signed on April 26, 2006. (*Id.* at R. Docs. 8, 11).  The record reflects that, before entry of the consent decree, plaintiffs' counsel met with EPA representatives on at least one occasion to discuss its terms. (Oral Argument, May 4, 2007).  In addition, after it was drafted, plaintiffs submitted comments on the proposed consent decree to the parties and court. (*See* Civ. Action No. 05-4662, R. Doc. 12).  EPA responded to the comments, but declined to revise the proposed consent decree. (*Id.*).  The court also addressed plaintiffs' comments before granting the government's motion for entry of the consent decree. (*Id.*).

Under the EPA consent decree, defendant is required to comply with New Source Performance Standards and must meet requirements for its Sulfur Recovery Plant.  The consent decree also imposes upon defendant affirmative obligations for flaring, including an enforcement mechanism for future flaring events. Defendant is also required to apply for new, federally enforceable Title V permits.  These new permits, in recognition

16

that defendant's previous levels were inappropriate, set lower levels for allowable emissions of nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter from defendant's coke barn.  Concurrently, defendant is required to reduce its discharges of nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter to comply with these new permit levels. The Title V permits, which have now been issued, *see* R. Doc. 110, at Ex. 3, are a necessary aspect of compliance with the Clean Air Act.  Additionally, defendant is required to comply with federal regulations governing benzene waste emissions and to implement plans to reduce or eliminate these emissions.

Other specific components of the EPA settlement include: defendant's investment of about $70 million in pollution control projects with reductions in sulfur dioxide and nitric oxide emissions of approximately 35 to 40 percent; defendant's payment of $3 million for beneficial environmental projects, $2 million of which is slated to go to the State Department of Wildlife and Fisheries and $1 million of which will be used to install a low emissions compressor at the refinery; and defendant's payment of a $1 million civil penalty, evenly divided between the state and federal governments.  Additionally, the consent decree includes stipulated penalty amounts for future exceedances of permits, as well as violations of program enhancement requirements and

reporting violations.  It calls for future penalties to be paid to the EPA and the LDEQ within sixty days of receipt of a demand for such penalty, though defendant retains the right to contest liability for a specific penalty.  Finally, the consent decree provides the following prerequisites to termination:

    i.    installation of control technology systems as specified in this Consent Decree;

    ii.   compliance with all provisions contained in this Consent Decree . . . ;

    iii.  payment of all penalties and other monetary obligations due under the terms of the Consent Decree; no penalties or other monetary obligations due hereunder can be outstanding or owed to the United States or the State;

    iv.   completion of the [Supplemental Environmental Projects] and the payment for [Beneficial Environmental Projects] . . . ;

    v.    application for and receipt of permits incorporating the surviving emission limits and standards . . . ;

    vi.   operation for at least one year of each unit in compliance with the emission limits established herein, and certification of such compliance for each unit within the first six month period progress report following the conclusion of the compliance period.

(*See* Civ. Action No. 05-4662, R. Doc. 11).

      Separately, on March 21, 2006, after the parties entered into the consent decree but before Judge Lemelle signed it, defendant entered into a settlement with the LDEQ in state court. Plaintiffs in this matter filed a petition challenging that settlement in the Nineteenth Judicial District Court for the Parish of East Baton Rouge.  The state court dismissed the

plaintiffs' petition and affirmed the LDEQ settlement on January 24, 2007.  (*See* R. Doc. 110, at Ex. 2).  Incorporating by reference the terms of the EPA consent decree, the LDEQ settlement imposed an additional provision that required defendant to donate air monitoring equipment valued at $800,000 to the LDEQ.

Defendant now represents that these settlements "cover all incidents and alleged [Clean Air Act] violations that form the basis of Plaintiffs' claims." (R. Doc. 110-3, at 3).  By contrast, plaintiffs assert that the settlements have not resulted in defendant's compliance with the Act so far as evidenced by the ten reported post-consent decree violations. Thus, they argue, there is no indication that the consent decree will lead to defendant's compliance in the future.

**D.   Defendant's Motion for Summary Judgment**

Because defendant's third argument in opposition to plaintiffs' summary judgment motion, discussed *supra*, is also the crux of its own cross-motion for summary judgment, and, if correct, could render the Court's inquiry into defendant's liability for most, if not all, of the above-listed violations unnecessary, the Court addresses it first.  The parties disagree as to whether the doctrines of *res judicata* and collateral estoppel bar any further remedies sought by plaintiffs for

19

defendant's alleged violations of the Clean Air Act.  As an initial matter, the parties dispute the threshold issue of whether these preclusion doctrines apply to citizen suits under the Clean Air Act.  The parties then, assuming *arguendo* that those doctrines can apply in this context, contest whether defendant can show that the required elements of those doctrines are met.

### 1.   Preclusion and the Clean Air Act

Plaintiffs contend in their opposition to defendant's motion for summary judgment that the common-law doctrines of *res judicata* and collateral estoppel cannot serve to bar a citizen suit under the Clean Air Act because "Congress has clearly delineated the circumstances in which citizen suits are precluded[,] and the Supreme Court has determined when the claims comprising such suits should be dismissed as moot."  (R. Doc. 114, at 8). Plaintiffs posit that the Clean Air Act "leaves no gap between the issues of statutory preclusion and mootness . . . ."  (*Id.*).  Under the statute, no citizen suit may be commenced

> (1) . . .
> (A) prior to 60 days after the plaintiff has given
> notice of the violation (i) to the Administrator,
> (ii) to the State in which the violation occurs, and
> (iii) to any alleged violator of the standard,
> limitation, or order, or
> (B) if the Administrator or State has commenced and
> is diligently prosecuting a civil action in a court
> of the United States or a State to require compliance

with the standard, limitation, or order . . . ."

42 U.S.C. § 7604(b)(1).  It is undisputed that plaintiffs' action

is not barred by either of these two tests, so that statutory

preclusion is not at issue.  Plaintiffs assert that the only

other doctrine that could bar the continued prosecution of their

claims against defendant is mootness.  In *Friends of the Earth v.*

*Laidlaw Environmental Services, Inc.*, the Supreme Court held

that, in the context of the Clean Water Act, citizen suits to

require compliance are rendered moot only after a showing that it

was absolutely clear that violations "could not reasonably be

expected to recur."  528 U.S. 167, 193 (2000); *see also Gwaltney*

*of Smithfield, Ltd. v. Chesapeake Bay Found.*, Inc., 484 U.S. 49,

66 (1987) ("The defendant must demonstrate that it is '*absolutely*

*clear* that the allegedly wrongful behavior could not reasonably

be expected to recur.'") (citing *United States v. Phosphate*

*Export Assn.*, Inc., 393 U.S. 199, 203 (1968) (emphasis in

original)).  Plaintiffs therefore argue that this is the correct

standard that the Court should apply in determining whether

plaintiffs' action can proceed against defendant in light of

defendant's settlements with the EPA and LDEQ, discussed *supra*.

The Court finds that plaintiffs' argument is without merit

as to the applicability of *res judicata* and collateral estoppel

principles to Clean Air Act cases.  At least four circuit courts

have either invoked the doctrine of *res judicata*, or acknowledged its applicability, in the context of Clean Air Act and Clean Water Act cases.[2]  *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 472-74 (6th Cir. 2004) (upholding district court's finding that *res judicata* barred plaintiffs' claims under the Clean Air Act); *Friends of Milwaukee's Rivers & Lake Michigan Fed'n v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 757-65 (7th Cir. 2004), *cert. denied*, 544 U.S. 913 (2005) (analyzing elements of *res judicata*, before ultimately rejecting application of doctrine, in Clean Water Act case); *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 773-74 (9th Cir. 1994) (affirming dismissal of plaintiffs' class action complaint under doctrine of *res judicata* in Clean Water Act case); *United States Envtl. Prot. Agency v. City of Green Forest, Arkansas*, 921 F.2d 1394, 1403-05 (8th Cir. 1990) (affirming district court's finding that *res judicata* and collateral estoppel barred plaintiffs' claims under the Clean Water Act).  Plaintiffs do not point to, and the Court cannot find, any case law that supports their assertion that the common-law doctrines of *res judicata* and collateral estoppel do not

_____

[2] The citizen suit provisions in the Clean Air Act and the Clean Water Act are virtually identical.  *See Gwaltney*, 484 U.S. at 57; *see also Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985) ("The citizen suit provision of the Clean Water Act was explicitly modeled on the similarly worded section 304 of the Clean Air Act.").

apply because the statute itself is silent on whether they may be invoked to bar a citizen suit not specifically precluded by the provisions of 42 U.S.C. § 7604(b)(1). *Cf. Envtl. Conservation Org. v. City of Dallas*, 2007 WL 1228039, at *3 (N.D. Tex. Apr. 26, 2007) ("The court is unaware of any authority which would prevent application of the well-settled principles of *res judicata* to citizen suits brought under the CWA."). The Court therefore sees no reason to go against the weight of reasoned circuit court authority on this issue. The Court concludes that *res judicata* and collateral estoppel principles may apply in a Clean Air Act case, such as this one, if the defendant can prove the respective elements of these doctrines.

> **2.   *Are plaintiffs' remaining claims precluded by* res judicata *and/or collateral estoppel?***

As an initial matter, defendant submits that the doctrines of *res judicata* and collateral estoppel may be used interchangeably because this case involves identical issues to those raised in the EPA consent decree and LDEQ settlement suit. (R. Doc. 110-3, at 19 n.6). Plaintiffs respond that defendant's motion improperly blurs the distinctions between the two doctrines. (R. Doc. 114, at 9). The Fifth Circuit recently stated that "[t]he rule of *res judicata* encompasses two separate but linked preclusive doctrines: (1) true *res judicata* or claim

preclusion and (2) collateral estoppel or issue preclusion."
*Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th
Cir. 2005).  The test for *res judicata* has four elements: (1) the
parties are identical or in privity; (2) the judgment in the
prior action was rendered by a court of competent jurisdiction;
(3) the prior action was concluded by a final judgment on the
merits; and (4) the same claim or cause of action was involved in
both actions.  *See Petro-Hunt, L.L.C. v. United States*, 365 F.3d
385, 395 (5th Cir. 2004).  A party not estopped under true *res
judicata* may still be estopped under the doctrine of collateral
estoppel.  *See Singh*, 428 F.3d at 572.  Collateral estoppel
requires three elements: "(1) the issue at stake is identical to
the one involved in the earlier action; (2) the issue was
actually litigated in the prior action; and (3) the determination
of the issue in the prior action was a necessary part of the
judgment in that action."  *Id*.  Collateral estoppel, unlike *res
judicata*, does not require mutuality between the parties in the
prior action and the parties in the subsequent action.  *See Allen
v. McCurry*, 449 U.S. 90, 94-95 (1980).  Contrary to defendant's
assertion, the differences therefore are of such a nature that
the Court analyzes whether each doctrine applies separately and
as necessary.

a.   Res Judicata

i.   *Parties are identical or in privity*

Chalmette Refining contends that privity exists between the plaintiffs and the governmental entities under the doctrine of *parens patriae*, which "grants standing to a state to sue on behalf of its citizens." *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)). "To maintain such an action, the state must assert a sovereign interest apart from the interests of particular private parties, such as a general interest in the health and well-being of its residents." *Id.* Put another way, "[i]n a proper *parens patriae* suit, the state or federal government is deemed to represent all of its citizens." *Green Forest*, 921 F.2d at 1404 (quoting *United States v. Olin Corp.*, 606 F. Supp. 1301, 1305 (N.D. Ala. 1985)). When either a state or federal government asserts *parens patriae* authority, courts have held that "it can bind the citizens of a state as privies for *res judicata* purposes." *Beretta USA*, 315 F. Supp. 2d at 265 (citing several cases, including two Supreme Court decisions). More specific to this case, courts have concluded that "once a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding

25

upon their rights." *Olin Corp.*, 606 F. Supp. at 1304.  Although the Fifth Circuit has not addressed this issue, other circuit courts have employed three different standards to determine whether a later-filed government enforcement action under the Clean Air Act or Clean Water Act brings the government into privity through the *parens patrie* doctrine with citizens who filed an earlier suit under these statutes.

The Eighth Circuit, in *Green Forest*, essentially relied on the entry of a consent decree between the municipality and the EPA to find *res judicata* as to plaintiffs' CWA claims without engaging in a substantive analysis of the contents of the decree or its potential impact on future violations.  The court stated:

> We recognize that there may be some cases in which it would be appropriate to let a citizens' action go forward in the wake of a subsequently-filed government enforcement action.  In view of the consent decree in the instant case negotiated by the EPA and Green Forest, however, this is not such a case. . . .  In view of the preeminent role that must be afforded the EPA in enforcing CWA violations – a role contemplated by the legislative history and recognized by the Supreme Court in *Gwaltney* – we hold that it was proper for the district court to dismiss [plaintiffs'] CWA claims against Green Forest after the latter had entered into a consent decree with the EPA.  The EPA is charged with enforcing the CWA on behalf of all citizens.  Since citizens suing under the CWA are cast in the role of private attorneys general, as a practical matter there was little left to be done after the EPA stepped in and negotiated a consent decree.

*Green Forest*, 921 F.2d at 1404.

The Seventh Circuit, in a more recent case, *Friends of Milwaukee's Rivers*, looked to whether the government enforcement action was capable of requiring compliance with the Clean Water Act and was in good faith calculated to do so, *i.e.*, whether there was a "diligent prosecution."  382 F.3d at 759 ("Thus, if the judicial action is capable of requiring compliance with the Act and is calculated to do so, the citizens' suit will be barred.") (internal citations omitted).  It stated: "[T]he focus . . . should be on whether the actions are calculated to eliminate the cause(s) of the violations." *Id.* at 760.  The court noted that "a diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement." *Id.* at 760.  But it added that "diligence does not require a state agency to have perfect foresight, and "the statute does not require that the [State] succeed; it requires only that the [State] try diligently." *Id.* at 759 (internal citations omitted).  On the merits, the Seventh Circuit found that the government enforcement action in *Friends of Milwaukee's Rivers* did not meet its "diligent prosecution" standard.  That determination was based on a record indicating a thirty-year history of sewage discharge violations and a concurrent failure

of stipulated remedial measures.  For instance, despite a 1994 effort to eliminate defendant's sewer overflows through a "Deep Tunnel" system, there had been multiple episodes of discharges between 1994 and 2002, when citizens filed suit under the Clean Water Act, totaling more than 13 billion gallons.  *Id.* at 749-50. Further, there was a demonstrated inadequacy in the most recent stipulation between defendant and the State of Wisconsin; the intent of the 2002 Stipulation, according to defendant, was to accomplish only the *eventual reduction* of sewer overflows, not their *elimination*.  *Id.* at 763-64.  The court thus did not require an actual end to violations, but instead looked to whether the government enforcement action was *designed* to bring about compliance.  *Id.* at 764.  Had there been a showing that the 2002 Stipulation was calculated to eliminate the overflow problems, that would have satisfied the court.  But the court did not find that.  The government enforcement action in *Friends of Milwaukee's Rivers* therefore failed the "diligent prosecution" test because of the specific facts in that case.

Finally, the Second Circuit, in *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.*, 933 F.2d 124 (2d Cir. 1991), used the test that is the least hospitable to a finding of *res judicata*.  In *Atlantic States*, the Second Circuit employed a standard akin to that used in the mootness context to determine

28

whether an earlier filed citizen suit could go forward under the Clean Water Act in light of a subsequent government action that resulted in a settlement between the defendant and a state enforcement agency.  The Second Circuit held: "If the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence - has eliminated the basis for the citizen suit - we believe that the citizen action must be dismissed."  *Id.* at 127.  The court then determined that "there has been no express finding in the instant matter that the settlement between Kodak and the New York authorities has caused the violations alleged by Atlantic States to cease and eliminated any realistic prospect of their recurrence."  *Id.* at 128.  The court thus concluded that "[b]ased on the present record . . . we cannot state with certainty whether Atlantic States has a basis for asserting that, notwithstanding Kodak's agreements with governmental authorities, there is a realistic prospect that Kodak will continue to violate the Clean Water Act as alleged in the complaint."  *Id.*  The court ultimately remanded the case to the district court with the following instructions:

> If the district court concludes that such violations
> are in fact continuing or, that, after giving some
> deference to the judgment of the state authorities,
> the terms of the settlement are such that a realistic
> prospect of continuing violations exists, Atlantic

> States may continue to pursue relief under the Clean
> Water Act.  If no such prospect exists, the action
> should be dismissed as moot.

*Id.*

After evaluating the parties' arguments and examining the relevant case law on this issue, the Court finds that the Seventh Circuit's "diligent prosecution" standard in *Friends of Milwaukee's Rivers* is the most practical and realistic approach to determining whether a government enforcement action is *res judicata* as to an earlier filed citizen suit under the Clean Air Act.  That is, the "diligent prosecution" analysis should look to whether the government enforcement action is capable of requiring compliance with the Clean Air Act and is in good faith calculated to do so.  *See Friends of Milwaukee's Rivers*, 382 F.3d at 760. This approach does not give the polluter a pass simply because it has reached a settlement with a government enforcement agency. On the other hand, it does not require a showing of immediate, perfect compliance when the polluter and a government enforcement agency have reached a settlement that puts into place a complex remediation plan.  In sum, this approach strikes a reasonable balance between the more lenient analysis employed by the Eighth Circuit in *Green Forest* and the stricter "elimination of all violations" test employed by the Second Circuit in *Eastman Kodak*. Moreover, this test reflects the purposes of the citizen suit

provision in the Clean Air Act where the citizen suit was filed before the government enforcement action because it preserves the efficacy of the citizen suit in those cases in which government enforcement actions are not calculated to bring about compliance with the Act.  At the same time, it permits subsequent enforcement actions that meet certain conditions to end an essentially duplicative civil suit.  As the Seventh Circuit stated, "if the subsequently-filed government action is a diligent prosecution, the fact that any private attorney general is barred from duplicating that effort should hardly seem surprising or harsh."  *Friends of Milwaukee's Rivers*, 382 F.3d at 759 (internal citations omitted).

The question then becomes: Do the settlements between the defendant and the EPA and LDEQ amount to "diligent prosecution(s)" under this standard?  The Court finds that they do.  The settlements, discussed *supra*, contain substantive provisions that on their face are directly designed to address longstanding problems at defendant's facility and, furthermore, are capable of requiring compliance with the Clean Air Act.  The 138-page EPA consent decree, for example, requires defendant to apply for new, federally enforceable Title V permits that set lower levels for allowable emissions of nitrogen oxides, sulfur dioxide, carbon monoxide, and particulate matter from defendant's

31

coke barn.[3]  Concurrently, defendant is required to reduce its
discharges of nitrogen oxides, sulfur dioxide, carbon monoxide,
and particulate matter to comply with these new permit levels.
Additionally, defendant is required to comply with federal
regulations governing benzene waste emissions and to implement
plans to reduce or eliminate these emissions.  These measures
will bring defendant's emission amounts into compliance with the
Clean Air Act, a fact that plaintiffs conceded during oral
argument.  The EPA consent decree also mandates construction of a
new flare gas recovery system and requires defendant to comply
with new source performance standards.  Violations of these
standards had been the subject of plaintiffs' second partial
motion for summary judgment in this litigation.  Furthermore, the
Court gave plaintiffs an opportunity during oral argument to
identify any issues asserted in their complaint that were not
addressed by the consent decrees or to point out areas in which
the consent decrees were incapable of producing compliance.
Plaintiffs failed to do so with any specificity whatsoever.  They
did not mention a single aspect of the consent decrees that was
too weak, otherwise insufficient, or not being enforced.

    Moreover, there is evidence in the record that the consent

---

[3] As noted earlier, the new permits have now been issued to
defendant.

decrees are already producing positive results at defendant's facility.  In the Court's earlier Orders on plaintiffs' first and second partial motions for summary judgment, the Court found defendant liable for 2,663 Clean Air Act preventable violations that occurred between 1999 and early 2005.  *See St. Bernard Citizens for Envtl. Quality*, 399 F. Supp. 2d at 726; *St. Bernard Citizens for Envtl. Quality*, 354 F. Supp. 2d at 701-06.  Put another way, defendant's reported Clean Air Act violations amounted to about 37 per month during this six-year period.  By comparison, plaintiffs' third motion for partial summary judgment (as well as their opposition to defendant's motion for summary judgment) is based on the fact that defendant has reported ten preventable violations of the Clean Air Act since entry of the consent decrees in April 2006.  These ten violations represent less than one per month between April 2006 and March 2007, when plaintiffs' filed their summary judgment motion.  Moreover, from 2002 until 2005, defendant reported about 15 violations per month of its permit limits on sulfur dioxide emissions, and, from 2003 until 2005, about 53 violations per month of its permit limits on benzene emissions.  These figures, post-consent decree, have been reduced to less than one per month and zero per month,

respectively.[4]

Additionally, at the time plaintiffs' brought their third motion for partial summary judgment, the consent decrees had been in effect for less than one year.  This is not enough time for the Court to conclude that the consent decrees are not capable of requiring compliance with the Act, as defendant has not been given an adequate chance to implement the remedial measures required by the consent decrees.  *Cf. Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 478 (6th Cir. 2004) ("In view of the mere three months that elapsed between the entry of the consent decrees and the district court's injunction and in view of [plaintiffs'] decision not to raise the issue with the EPA, it can hardly be said that the Government in this instance was unwilling or unable to enforce the decrees.").  The consent decrees envision defendant's spending millions of dollars on improvements to its facility, as well as meeting other affirmative obligations designed to bring defendant into compliance with the Act.  Given the complexity of the remediation scheme, it is unrealistic to expect total elimination of defendant's violations within the time frame involved here.

_____

[4] The Court also notes that, under the terms of the EPA consent decree, defendant will pay specified penalties for both the pre- and post-consent decree violations asserted in plaintiffs' third motion for partial summary judgment.

Finally, the absence of an explicit provision in the consent decrees requiring compliance with the Act does not mean, as plaintiffs assert, that these actions do not constitute a "diligent prosecution."  The Seventh Circuit dismissed a similar argument in *Friends of Milwaukee's Rivers*.  There, the Seventh Circuit concluded that "the focus of the diligent prosecution inquiry should be on whether the actions are calculated to eliminate the cause(s) of the violations.  Since [Milwaukee Metropolitan Sewerage District] was not relieved from complying with the Act and its permit, the addition of compliance language . . . is unnecessary and would not bring about compliance any faster or more efficiently."  382 F.3d at 760.  The absence of compliance language here is likewise irrelevant to the ultimate issue of whether the consent decrees are capable of requiring compliance with the Act and are in good faith calculated to do so.  These decrees meet this standard.

Defendant has therefore carried its burden on summary judgment of demonstrating that the consent decrees indicate diligent prosecution by the government agencies under the privity analysis.  As such, the Court concludes that privity exists between the plaintiffs and the governmental entities under the doctrine of *parens patriae*.

> ii.  Judgment in the prior action was
>      rendered by a court of competent
>      jurisdiction

Plaintiff does not contest that this prong is satisfied by virtue of the fact that the EPA and LDEQ settlements were entered as judgments by, respectively, the United States District Court for the Eastern District of Louisiana and the Nineteenth Judicial District for the Parish of East Baton Rouge, Louisiana.  Both clearly are courts of competent jurisdiction as that term is contemplated by the *res judicata* doctrine.

> iii. Prior action was concluded by a final
>      judgment on the merits

Plaintiff contends that the EPA and LDEQ settlements are not final judgments on the merits.  The Court finds this argument wholly without merit.  The EPA consent decree was entered by Judge Lemelle of this Court on April 26, 2006.  The case was then administratively closed on August 18, 2006, and no further action has been taken in the matter.  (*See* Civ. Action No. 05-4662, R. Doc. 13).  Similarly, the Nineteenth Judicial District for the Parish of East Baton Rouge affirmed the LDEQ settlement with defendant on January 24, 2007 after plaintiffs in this matter petitioned for review of the agreement.  (R. Doc. 110, at Ex. 2). The state court dismissed plaintiffs' challenge to the agreement and dismissed the case.  (*Id.*).  Courts in similar contexts have

36

had no difficulty concluding that federal and state settlements, such as those fashioned here, satisfy this prong of the *res judicata* analysis.  *See Friends of Milwaukee's Rivers*, 382 F.3d at 757-65; *Eastman Kodak*, 933 F.2d at 127-28; *Green Forest*, 921 F.2d at 1403-05.  While plaintiffs may disagree with the ultimate disposition in the state and federal courts regarding defendant's settlements, it is nevertheless undisputed that these courts approved both the EPA and LDEQ settlements in final judgments in those respective proceedings.

> iv.  *Same claim or cause of action was involved in both actions*

Plaintiffs do not contest this prong of the *res judicata* analysis.  While they oppose the manner in which the settlements address various aspects of their complaint, they do not argue, and the Court does not find, that the same claims or causes of action set forth in plaintiff's complaint were not at issue in the EPA and LDEQ settlements.

In sum, the Court finds that the EPA and LDEQ consent decrees satisfy the four elements of *res judicata*.  Plaintiffs are therefore precluded from continuing to litigate the same issues in their citizen suit.

> b.  *Collateral Estoppel*

In light of the Court's holding as to the applicability of

*res judicata*, *supra*, it is unnecessary to discuss collateral estoppel.

**E.   Plaintiffs' Motion for Summary Judgment**

The Court now turns to plaintiffs' motion for summary judgment as to defendant's liability for the additional violations of the Clean Air Act, discussed *supra*.  The violations were initially disclosed in 19 unauthorized discharge reports filed with the LDEQ.  The Court has already concluded that unauthorized discharge reports are competent evidence to demonstrate that defendant violated emissions standards or limitations promulgated under the Clean Air Act and Louisiana's state implementation plan.  *See St. Bernard Citizens for Envtl. Quality, Inc.*, 354 F. Supp. 2d at 707 (citing authorities). Defendant has not challenged plaintiffs' calculation of the amounts or numbers of violations on which plaintiffs seek summary judgment here.

In an enforcement action, "[a]ll the Court here is called upon to do is compare the allowable quantities of pollution listed in the permits with the available statistics on actual pollution."  *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 452 (D. Md. 1985) (citation omitted); *see also Pub. Interest Research Group of New Jersey, Inc. v. Rice*, 774 F. Supp. 317, 325 (D.N.J. 1991) (in Clean Water Act case, "[a] violation

38

of a permit limitation by a discharger is an automatic violation
of the Act"). Strict enforcement of applicable permits is in
accordance with the legislative history of the Clean Air Act,
which "plainly reflects a congressional intent that claims of
technological and economic infeasibility not constitute a defense
to an adjudication of violation of applicable" Clean Air Act
requirements. *Friends of the Earth v. Potomac Elec. Power Co.*,
419 F. Supp. 528, 535 (D.D.C. 1976).

Defendant, however, contends that, irrespective of whether
it violated its permits in the manner that plaintiffs allege, it
is not liable for the vast majority of the incidents because
plaintiffs did not properly notice those violations in its suit
as required under 42 U.S.C. § 7604(b)(1)(A).[5]  The Court rejects
this contention. Courts have held that "a notice letter which
includes a list of discharge violations, by parameter, provides
sufficient information for the recipients of the notice to
identify violations of the same type (same parameter, same
outfall) occurring during and *after* the period covered by the
notice letter." *Pub. Interest Research Group of New Jersey, Inc.*

---

[5] Defendant concedes that plaintiffs properly noticed the
following three incidents: April 15-21, 2003, May 3-5, 2003
(which defendant contends actually occurred on May 7, 2003), and
October 4, 2003.  (R. Doc. 115, at 2).  Each of those incidents
occurred before plaintiffs provided defendant with notice of the
violations at issue on December 4, 2003.

*v. Hercules, Inc.*, 50 F.3d 1239, 1250 (3rd Cir. 1995); *see also Friends of the Earth, Inc. v. Chevron Chem. Co.*, 900 F. Supp. 67, 77 (E.D. Tex. 1995) (citing *Hercules*, 50 F.3d at 1250). Moreover, "as long as a post-complaint discharge violation is of the same type as a violation included in the notice letter (same parameter, same outfall), no new 60-day notice letter is necessary to include these violations in the suit." *Hercules*, 50 F.3d at 1250.  Put another way, "[w]hen post-complaint exceedances are of the same parameter as those exceedances detailed in the initial notice, the initial notice provides a permittee and the EPA with sufficient notice of the plaintiff's intent to sue and of the pollution problem." *Friends of the Earth*, 900 F. Supp. at 77.  Here, plaintiffs properly noticed in their complaint emission exceedances due to flare malfunctions and emission limitation exceedances for sulfur dioxide, nitrogen oxides, volatile organic compounds, benzene, carbon monoxide, and other harmful pollutants.  These noticed violations account for all of the discharges set forth in plaintiffs' motion for summary judgment.[6]  Thus, plaintiffs have not sought to circumvent the

---

[6] The Court notes again that plaintiffs concede that they "arguably may not have provided adequate notice" to defendant as to the incidents that occurred on March 4, 2004 and January 7, 2005.  (R. Doc. 120, at 8).  Plaintiffs thus have withdrawn their motion for summary judgment as to liability for those two incidents.  (*Id.*).

Clean Air Act's statutory notice provision through this motion.

However, while properly noticed, the Court finds that defendant is not liable for fifteen of the remaining seventeen incidents for the reasons discussed in the Section on defendant's summary judgment motion, *supra*.  It is uncontested that the consent decrees address, either retrospectively (pre-consent decree violations) or prospectively (post-consent decree violations), the relevant conduct underlying those violations.  Thus, under the Court's *res judicata* analysis, the consent decrees preclude plaintiffs from pursuing further remedies through this suit, including for the violations asserted in the summary judgment motion, with two exceptions.  Defendant concedes that the consent decrees do not cover the July 17, 2005 and October 13, 2005 incidents.  (R. Doc. 115, at 7).  Defendant is therefore liable under the Clean Air Act for these two violations, and the Court grants summary judgment for the plaintiffs with regard to them.

## IV. CONCLUSION

This litigation, commenced more than three years ago in an effort to address serious and sustained environmental problems in St. Bernard Parish caused by Chalmette Refining, has now resulted in a finding of liability against defendant for 2,665 violations

of the Clean Air Act.   Moreover, it almost certainly served as a major catalyst in the drafting and entry of the EPA and LDEQ consent decrees.   Even plaintiffs concede that the consent decrees were designed to bring about compliance with appropriate permit levels under the Clean Air Act.   The decrees also imposed substantial penalties and capital improvement requirements on defendant.   Certainly, if in time the settlements do not actually lead to compliance, plaintiffs may provide notice of the continued violations to EPA, LDEQ, and defendant under 42 U.S.C. § 7604 and ultimately may file another citizen suit.   However, at this point, the comprehensive nature of the EPA and LDEQ consent decrees leads the Court to conclude that there has been a "diligent prosecution" by the government enforcement agencies. Consequently, it is appropriate for the Court to grant defendant summary judgment as to all of plaintiffs' present and future claims in this litigation on the grounds of *res judicata*, with the exception of the July 17, 2005 and October 13, 2005 violations, for which the Court grants plaintiffs summary judgment on defendant's liability.

New Orleans, Louisiana, this ___ 10th day of August, 2007.

_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE